***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission AFFIRMS the Opinion and Award of Deputy Commissioner Holmes with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as: *Page 2 
 STIPULATIONS
1. All defendants are proper party-defendants brought before the Commission, and the Commission has jurisdiction over the subject matter.
2. At all times relevant to this action, defendant Cooper Standard was self-insured. From January 25, 2005, the date of injury for I.C. File No. 503103, through to the present, including February 1, 2006, the date of injury for I.C. File No. 621596, St. Paul/Travelers Insurance was the third party administrator.
3. Plaintiff's average weekly wage was $492.00 per week at the time of her compensable occupational disease in I.C. File No. 503103, yielding a workers' compensation rate of $328.01. Plaintiff's average weekly wage was $532.77 at the time of her alleged occupational disease in I.C. File No. 621596, yielding a workers' compensation rate of $355.18.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff Gladys Ayers was born in November 1946 and was 61 years old at the time of the hearing before the Deputy Commissioner.
2. Plaintiff began working for the defendant employer in 1985 and worked for defendant until October 6, 2006.
3. Defendant is in the business of manufacturing window seals for automobiles.
4. During her employment, plaintiff performed a variety of different positions with defendant, including trimmer, machine operator, and mold operator. All of the jobs with defendant were production jobs manufacturing different types of parts, and all of the jobs had *Page 3 
quotas for the number of parts to be manufactured each day.
5. Beginning March 2002 plaintiff developed problems with her right and left hands and right shoulder. Plaintiff was treated at Goldsboro Orthopaedic Associates and was diagnosed with a rotator cuff tear and bilateral carpal tunnel. Plaintiff elected against surgery and received conservative treatment. In September 2003 she was released at maximum medical improvement and was given permanent restrictions of lifting twenty pounds maximum and no working the molding machines. She was given five percent impairment ratings to her right and left hands and also to her right shoulder. Defendant appropriately paid plaintiff permanent partial disability benefits based upon the ratings.
6. Plaintiff continued working for the defendant, but in a different position. On January 25, 2005 she was at work when she tripped over a hole and fell. This January 2005 injury was assigned I.C. File No. 503103. Plaintiff's injuries, consisting of injuries to "both shoulder [sic], both knees, left ankle which was minor and low back," were accepted as compensable by defendant on a Form 60. She was diagnosed with rotator cuff tendinitis and degenerative scoliosis exacerbated by the fall, lateral epicondylitis, and knee contusions. In June 2005, plaintiff had another event leading to a temporary "exacerbation of her underlying condition." She aggravated her back and experienced a flare up of pain with symptoms of radiculopathy, requiring her to miss a short period of work. The defendant determined that this event should be treated as a continuation of the January 2005 claim file. By July 2005 she was ready to be released and rated.
7. An FCE was performed on August 16, 2005. Plaintiff had permanent work restrictions due to the compensable 2005 injury of twenty pounds maximum lifting, ten pounds frequent lifting, maximum ten pounds lifting over her head and 20 to shoulder level. She received *Page 4 
a ten percent rating to her back.
8. On August 17, 2005, plaintiff was transferred to a different department, D-186. For the first four months, plaintiff primarily operated a header notch machine and a bender machine. Plaintiff's assignment required her to alternate throughout the day between the two machines, working each one about thirty minutes at a time. The first step was to operate the bender machine, which involved using her hands to press a three-foot rubber strip into the machine, push a button, and then remove the strip. She performed those steps over and over until time to switch to the header notch machine. On that assignment, her second step was to inspect and trim the metal tips of the strips. She testified that she had to trim about half the strips. The final step was to feed the strips into the machine that would notch the metal tips, which could require her to push hard to insert the strips in. Trimming was hardest on her hands and required her to grip hard. The entire process required her constantly to use her hands.
9. Plaintiff's production requirement was to complete one hundred pieces per hour. As plaintiff began performing the header notch and bender machines, she began noticing tingling in her hands and mentioned her symptoms to her supervisors, but the symptoms were not great enough to go to the doctor.
10. In early 2006 plaintiff was reassigned to do trimming. On that job she used a pair of scissors to trim rubber pillars by hand. The strips were the thickness of her middle finger and had to be trimmed at each end. To perform the job she would pick up a pillar, hold it between her third and fourth fingers of the left hand, trim both ends with the right hand, put it in a tray, and pick up the next piece. She completed five pieces in ten to fifteen minutes, so that each pieces took two to three minutes. She testified that she was "constantly snipping" during that time and that the scissors would be dull and hard to use. After she filled a tray she moved it aside and *Page 5 
began another tray. She repeated this process continuously during her 8 hour shift, with no rotation.
11. After she was assigned to the trimming job, plaintiff experienced more problems with her hands as well as her upper back. She noticed tingling and swelling in her hands, her left ring finger began locking, and her neck was tight and sore. Plaintiff complained to her line leader and unsuccessfully requested to rotate off the position.
12. Plaintiff's testimony describing the processes she performed; the header, notch and bend saw machines and the trim work, was not contradicted by any of defendant's witnesses, and Danny Best, defendant's operations manager, agreed with plaintiff's description of her duties.
13. In April 2006 plaintiff testified she reported her problems to defendant and asked for workers' compensation benefits.
14. When plaintiff complained of her hands in 2006, defendant no longer had a plant nurse and she was not returned to Goldsboro Orthopaedic for an opinion if the problems were work-related. While Danny Best testified he was unaware the trigger finger was claimed to be work related, the evidence as a whole establishes Cooper Standard was aware of the claim. Cooper Standard prepared an injury report at the time and on May 1, 2006 issued a Form 61 denying the claim. The carrier denied the claim "due to the fact that an injury such as yours must result from an accident occurring at work." Defendant never identified a factual basis for denying the claim.
15. On May 31, 2006, Plaintiff returned to Goldsboro Orthopaedic on her own to get medical treatment for her hands. Dr. Bauer diagnosed recurrence of carpal tunnel syndrome, left trigger finger, and thoracic back strain. Plaintiff had surgery for her trigger finger on July 18, 2006 and was taken completely out of work from that date through October 6, 2006, when she was *Page 6 
released with no restrictions due to the finger. During this period, she received short term disability in the amount of $309.00 per week.
16. Plaintiff took leave from her employment for her trigger finger under the Family Medical Leave Act in July, 2006 and received short term disability benefits at $309.00 per week, which was fully funded by the defendant. The leave period was from July 18, 2006 until October 10, 2006.
17. Effective October 2006, defendant changed its "Transitional Employment" policy so that employees on permanent work restrictions who were unable to perform a "regular routed job" would be terminated. Plaintiff was still on restrictions due to the compensable 2005 injuries as well as the compensable 2002 injuries at the time the employer's policy was changed.
18. On October 6, 2006, before she was able to return to work, plaintiff was laid off from her job. Defendant acknowledged that it laid her off due to the fact that she was on restrictions. A chart created by defendant lists the individuals laid off and indicates the restrictions qualifying them for layoff. Plaintiff's restrictions were listed as "exert 20 lbs occ 10 lbs freq; lift 10 lbs overhead 20 lbs to shoulder; no lifting over 20 lbs and no molds — permanent rest." The "injury date" for the restrictions was identified as "1/25/2005" and the restrictions were categorized as "WC" (workers' compensation).
19. Plaintiff was officially terminated on April 9, 2007.
20. Plaintiff did not receive any severance or vocational assistance from defendant, or any workers' compensation benefits. Plaintiff applied for and received unemployment benefits.
21. In spring 2007, she also applied for federal benefits under the federal Trade Act, 19 U.S.C. 2273. Under the Trade Act, additional benefits are payable to employees whose jobs are eliminated due to the transfer of jobs overseas. In order to qualify workers for certain Trade *Page 7 
Act benefits, the federal government must determine that a significant number of workers are age 50 or older and possess skills that are not easily transferable. 19 U.S.C. 2272; see also US Dept. of Labor, "Trade Adjustment Assistance and Alternative Adjustment Assistance Application Process." The US Department of Labor determined that the Cooper Standard employees, including plaintiff, were qualified under those standards for both TAA and ATAA benefits. Plaintiff received Trade Act benefits beginning in April 2007 through approximately November 2007. The benefit program was administered through the local Employment Security Commission offices, but is not a state unemployment benefit.
22. After her layoff, plaintiff immediately began job hunting. Seeking employment is required for North Carolina unemployment benefits, even though the local ESC office did not require documentation of her job searches. Upon receiving Trade Act benefits, she was required to submit job logs. In addition, she maintained a separate log for purposes of her workers' compensation claim which began on September 10, 2007, and continues through December 4, 2007. The job search logs show plaintiff regularly contacted several employers each week to find work and her search was consistent each week through the date of the Deputy Commissioner hearing. Plaintiff's job hunting including searching the newspaper every day, making cold calls to employers and getting leads from family and friends. Plaintiff does not have a computer and did not conduct computer searches. The jobs plaintiff explored cover a wide variety of occupations and include: restaurant, cafeteria, janitorial, rental store, retirement community worker, retail sales, housekeeping and laundry at a hotel, delivery driver, bus operator, assembly work, community corrections, and veterinary assistant. The prospective employers ranged from small to large; Wayne Memorial Hospital, Eckerd, Sears, Anchor Coupling, Wayne Correction Center. The job logs reveal plaintiff regularly submitted applications but often was told to return or that *Page 8 
the employer was not hiring. While plaintiff did not maintain job search logs prior to April 2007, her testimony that employment searches followed a similar manner and reached similar results during the October 2006 to April 2007 period is credible.
23. Despite looking regularly for work, plaintiff has been unable to find employment through the date of the hearing before the Deputy Commissioner. Plaintiff's credible testimony establishes that she never turned down a physically suitable job and that her unemployment benefits counselor recommended that she not apply for jobs that required fifty or sixty pounds of lifting since this requirement was outside of her physical limitations.
24. Defendant did not proffer any testimony rebutting plaintiff's evidence of job searches, or submit any expert vocational evidence to establish her transferable skills or suggest plaintiff's job hunt was unreasonable in light of her work background, sixty-one year age, and education.
25. Plaintiff's work background reflects few transferable work skills. Before working for Cooper Standard, she worked as a cook, cashier, cosmetologist and textile machine operator. While she earned her high school diploma in 1965 and received a cosmetology license in 1984, she has no other specialized education or training. She has no experience or skills operating office machinery.
26. Since her layoff, there are no jobs available at Cooper Standard that plaintiff is qualified to perform.
27. Dr. Gregory Bauer, an expert in orthopaedics at Goldsboro Orthopaedic, was the only expert to testify in the present action. With respect to the 2005 diagnoses, Dr. Bauer testified, and the Full Commission finds, that all of plaintiff's injuries were the result of her January 2005 fall. These injuries included a herniated disk and exacerbation of pre-existing *Page 9 
underlying disk disease. Plaintiff's aggravation of her back in June 2006, including radiculopathy, was a temporary aggravation of the compensable back injury of January 2005 and was not a new injury. Dr. Bauer's expert testimony also establishes that plaintiff requires future medical care for her conditions, including the possibility of carpal tunnel surgery and medications.
28. Dr. Bauer testified, and the Full Commission finds, that plaintiff's symptoms in 2006, consisting of trigger finger and recurring carpal tunnel syndrome, were both work-related and specifically that her duties in fall of 2005 and early 2006 operating the header notch machine and working as a trimmer significantly contributed to her development of those conditions and would have placed her at increased risk of developing those conditions.
29. Dr. Bauer assigned plaintiff work restrictions in 2003 due to her carpal tunnel syndrome and shoulder injury. Those restrictions were twenty-pound lifting and no use of the molding machine. Dr. Bauer explained that the molding machine restrictions applied to all jobs in the general work force to negate repetitive forceful gripping of the hands. Those restrictions were permanent.
30. Plaintiff's work restrictions from the 2005 injury were stricter than those from 2003, and are also permanent. In addition to the lifting restrictions set out in the FCE and because of her back problems, plaintiff may perform sedentary job duties only if she is permitted frequent breaks and to walk around every two hours. Dr. Bauer testified, and the Full Commission finds, that plaintiff's carpal tunnel problems also restrict plaintiff from extreme flexion and extension of the wrist.
31. Defendant's defense of this claim is not unreasonable based upon the complexity of the factual issues arising from multiple injuries sustained by the plaintiff and the application of law to the factual basis for this claim. *Page 10 
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff's left ring trigger finger and recurrence of her carpal tunnel diagnosed in 2006 are compensable occupational diseases for which the defendant is liable under plaintiff's claim asserted in I.C. File No. 621596. Plaintiff is entitled to compensation for past medical expenses necessary to treat those conditions. N.C. Gen. Stat. §§ 97-52 97-53(13).
2. Plaintiff was totally disabled from working due to her compensable hand injuries in I.C. File No. 621596, for the period from July 18, 2006 through October 5, 2006. Plaintiff is entitled to disability benefits from defendant for that period. Defendant shall be allowed a credit, to be determined week by week, for the short term disability benefits paid to plaintiff during that period. N.C. Gen. Stat. § 97-42.
3. In January 2005 plaintiff sustained compensable injuries to her low back and shoulder which defendant accepted as compensable in I.C. File No. 503103.
4. The aggravation of plaintiff's back condition in June 2005 was temporary and was a continuation of her original compensable injury.
5. As a result of her compensable injuries in IC file No. 503103, plaintiff suffered permanent significant restrictions. Those permanent restrictions were in place on October 6, 2006 and remain in place. N.C. Gen. Stat. § 97-2(6).
6. On October 6, 2006, defendant employer terminated plaintiff due solely to her permanent work restrictions from her 2005 compensable injuries asserted in I.C. file No. 503103. Plaintiff sustained lost earnings from that date through the date of the hearing before the Deputy *Page 11 
Commissioner, and ongoing. Plaintiff's ongoing disability is a result of her compensable injuries in I.C. File No. 503103.
7. Plaintiff has proven by the greater weight of the evidence that while she may be capable of some work, she has been unable to obtain suitable employment after a reasonable job search. Plaintiff has the burden of proving disability, defined as a loss of wage earning capacity. Russell v. Lowes Product Distribution, 108 N.C. App. 762,425 S.E.2d 454 (1993). In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682
(1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485
(2001); Russell v. Lowes Product Distribution, supra.
8. Plaintiff is entitled to temporary total benefits from October 6, 2006 through the date of this Opinion and Award and ongoing until she returns to some type of gainful employment, or until further order of the Commission.
9. Defendant is entitled to a credit for unemployment benefits received under the Employment Security Law; however, defendant is not entitled to a credit for the federal Trade *Page 12 
Act benefits received by plaintiff because such benefits are not a state unemployment benefit. N.C. Gen. Stat. § 97-42.1, see also, Evans v. AT T Tech., 103 N.C. App. 45, 404 S.E.2d 183, rev'd on other grounds,332 N.C. 78, 418 S.E.2d 503 (1992) (no other statutory authority for credit other than N.C. Gen. Stat. § 97-42).
10. There is insufficient evidence of record to order the Defendants to pay attorney fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. As a result of her compensable occupational diseases consisting of recurrence of carpal tunnel syndrome and trigger finger of February 1, 2006, and based on an average weekly wage of $532.77, Defendant shall pay in compensation to plaintiff consisting of total disability benefits from July 18, 2006 through October 5, 2006, less a credit, to be calculated week by week, for any short term disability benefits paid to plaintiff during that period.
2. Defendant shall pay for plaintiff to see a physician of her choice in order to obtain a second opinion on any permanent impairment rating for her trigger finger or recurrent carpal tunnel syndrome, pursuant to N.C. Gen. Stat. § 97-25.
3. As a result of her compensable injuries dated January 25, 2005, and based on an average weekly wage at the time of those injuries of $492.00, defendant further shall pay compensation to plaintiff consisting of total disability benefits for the period from October 6, 2006 through to the present, and continuing until such time as plaintiff returns to suitable employment or until further order of the Commission. The defendants shall receive a credit for unemployment *Page 13 
benefits received by the plaintiff.
4. After credits due the defendant are deducted from compensation due to plaintiff, an attorney fee for plaintiff's counsel is approved in the amount of 25% of the compensation awarded to plaintiff in paragraphs one and three of this Award. Of the said amount that has accrued the defendant shall deduct twenty-five percent of said compensation and send directly to plaintiff's attorney. Of the continuing amount, the defendant shall send every fourth compensation check to plaintiff's counsel.
5. The defendant shall pay the costs including an expert witness fee of $550.00 to Dr. Gregory Bauer if not already paid by prior order.
This __ day of June 2009.
S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ PAMELA T. YOUNG CHAIR *Page 1